IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| CALVIN FREEMAN, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 4:15-cv-00968-NKL |
| CAROLYN W. COLVIN,<br>Acting Commissioner<br>of Social Security, | ) ) ) ) ) | |
| Defendant. | ) | |

**ORDER**

Plaintiff Calvin Freeman appeals the Commissioner of Social Security's final decision denying his application for disability insurance benefits and supplemental security income. The decision is reversed and the case remanded.

**I.  Background**

Freeman was born in 1959 and has worked as a cook, housekeeper, and janitor. He alleges he became disabled beginning on June 21, 2013.

**A.  Medical history**

**1.  Respiratory issues**

Freeman has chronic obstructive pulmonary disease, asthma, and other respiratory conditions. From July 2012 to April 2014, he has gone to the emergency room or been admitted to the hospital about 22 times for shortness of breath, including shortness of breath that caused him to wake up at night; wheezing; dyspnea; tachypnea; cough; pneumonia; or acute asthma exacerbation. From November 2012 to October 2015, he was seen by a doctor or at a clinic at least 12 times concerning breathing difficulties or in follow-up to his hospital visits. He has been

prescribed inhalers, steroids, and other medications for both short- and long-term treatment. Although a provider noted in March 2014 that Freeman reported walking two or three miles per day, in June 2014, another provider observed that Freeman's shortness of breath caused him significant distress when walking inclines and stairs, and in March 2015, Freeman failed a stair-walk test.

### 2. Psychiatric issues

At a November 2012 clinic visit relating to uncontrolled asthma, the provider noted Freeman had a depressed mood and affect. In June 2013, Freeman went to the emergency room because he was having thoughts of suicide. He reported hearing voices telling him to hurt himself by drinking bleach. After a 12-day stay, he was discharged with diagnoses of depression and cocaine abuse, and prescriptions for psychotropic medications. In July 2013, he went to a clinic to start the process for receiving psychiatric services, and was referred for medication management and therapy. At a subsequent intake visit, examination revealed he had blocking thought processes, poor impulse and anger control, and flat affect. He was diagnosed with severe depression and paranoid schizophrenia, and referred for a complete psychiatric evaluation. Freeman saw Dr. Nallu Reddy, a psychiatrist, at the end of July, reporting that he was afraid of sounds and hearing voices telling him to hurt himself. His mood was depressed. Dr. Reddy diagnosed paranoid schizophrenia and prescribed medications. At a medical appointment in August 2013, the provider noted Freeman was having leg tremors and thought they might be associated with Haldol, which Dr. Reddy had prescribed. The Haldol was later discontinued.

At a visit with Dr. Reddy in February 2014, Freeman reported that he liked his current combination of medications, Celexa and Seroquel, and was not having side effects; he was happy

2

and smiling at the visit. At an April 2014 visit, Freeman told Dr. Reddy that during a recent hospitalization, he had been given Haldol instead of Seroquel, causing leg weakness, and that he wanted to return to his prior to combination of medications. Dr. Reddy prescribed Celexa and Seroquel, and continued Freeman's diagnosis of paranoid schizophrenia. At an August 2014 visit, Dr. Reddy noted Freeman was going through multiple medical problems, including asthma, hypertension, and heart problems, and was having specialist appointments. The doctor discussed options for other medications in place of the Seroquel, which was causing Freeman to gain a great deal of weight, but Freeman said the Seroquel helped with sleep and the voices. The doctor continued the diagnosis of paranoid schizophrenia, and renewed the prescriptions for Celexa and Seroquel. He noted Freeman would continue therapy, and encouraged him to have goals such as attending the clinic's day program at least twice a week.

At his late-August 2014 annual evaluation for community support services at Swope Clinic, Freeman reported to his case manager that he experienced auditory hallucinations with commands to hurt himself, paranoia, depression, and other symptoms, and that he was stressed by his health and having several appointments with different providers. The case manager noted Freeman had blunt affect with low anger control. The evaluation summary included treatment recommendations, with which Freeman agreed, including continuing to receive community support services at the rehabilitative level, and seeing his psychiatrist, primary care physician, specialists, therapist, home healthcare nurse, and a nutritionist, and continuing to take prescribed medications. Dr. Reddy approved the evaluation report.

At an October 2014 therapy session, Freeman was experiencing paranoia, depression, and insomnia. He said he had not been feeling well lately due to deaths in the family and had just returned from a family-member's funeral in another state. He said he had been out of

3

medications for six days and was starting to hear voices and feeling irritable. He said he was spending most of his time in the house because he did not like to be around people. The counselor noted that Freeman was receptive to therapy and to working on his mental health issues. Freeman told the counselor that he had been practicing daily living skills to improve his daily functioning. The following week, Freeman saw Dr. Reddy for medication follow up. After discussing medication alternatives, Freeman was continued on Celexa and Seroquel. The doctor continued Freeman's diagnosis of paranoid schizophrenia, and instructed him to continue attending therapy to learn coping skills, participating in the community support program for assistance with independent living, and seeing his primary care doctor, eye doctor, and dentist for his physical issues.

From July 2013, when Freeman was discharged from his 12-day hospital stay for suicidal ideation, through his September 2014 annual case management review, Dr. Reddy and his other mental health care providers gave Freeman GAF scores of 50, 32, 38, 42, 45, 45, 46, and 34, in order. Tr. 350, 239, 709, 889, 886, 860, 845-46, and 862.

### 3. Other issues

In 2014, Freeman had episodes of dizziness and fainting. He went to the emergency room in May after a fainting episode, and followed up with doctors at least four times. He was referred for neurological and cardiac evaluations, and had a chest CT, two EEGs, and other tests, all of which were essentially negative. In November, suspecting that one of Freeman's psychiatric medications, Seroquel, could be contributing to his symptoms, a cardiologist recommended he speak with his psychiatrist about it.

Freeman complained of knee pain starting in December 2013. At a consultation in January 2014, Dr. James Bogener, an orthopedic surgeon, observed swelling in the right knee

4

and bilateral chondral loss in the medial aspect of both knees. He recommended physical therapy and prescribed an anti-inflammatory. Freeman saw Dr. Bogener again in March 2014, complaining of patellar pain. An MRI showed mild patellofemoral arthritis and possible bilateral meniscal tears in the knees. The doctor recommended that Freeman modify his activities, use anti-inflammatories, and attend physical therapy for patellofemoral rehabilitation.

A January 2015 MRI of Freeman's left shoulder showed a labral tear, tendinosis and peritendinitis, AC and glenohumeral degenerative arthrosis, and possible slight instability of the humeral head.

### B. Freeman's testimony

Freeman testified at the hearing of November 10, 2014. He lives with his sister. He said he had difficulty breathing and had to use a nebulizer for breathing treatments once a week, a rescue inhaler up to two times a day, and a CPAP machine every night. He was also on daily prescription medication for his COPD and that exposure to chemicals or warm weather caused his symptoms to worsen.

He had been diagnosed with schizophrenia, which caused him to suffer auditory hallucinations and panic episodes. He said his panic attacks were worse when he was outside after dark, but his auditory hallucinations were a constant symptom. He received mental health treatment and was on prescription medication for his schizophrenia.

Freeman said he has knee pain and was prescribed a cane for ambulation because sometimes his knees would give out. He also said he had left shoulder pain and was restricted in how high he could lift his left arm.

He testified that he spent most of his day at home doing household chores or lying down. He could do chores such as washing the dishes or taking out the trash, but had to take breaks due

5

to his asthma and could not do any yard work. Freeman testified that he did have a driver license but could not drive due to restless legs and someone had to take him to the doctor. He could lift up to fifteen pounds, sit for 35 to 40 minutes at one time, walk down nine steps before needing to rest, and stand for 20 minutes.

### C. Expert reports

Dr. Reddy completed a Medical Source Statement—Mental on October 6, 2014. Tr. 1018-19. He noted Freeman was diagnosed with chronic paranoid schizophrenia. He opined that Freeman's diagnosis caused him to have bad days where he would miss approximately four days of work per month and would likely be off task twenty-five percent or more of the time. He opined that Freeman was markedly limited in his ability to: understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerance; work in coordination with or proximity to others without being distracted by them; make simple work related decisions; complete a normal workday/week without interruption from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. The ALJ gave Dr. Reddy's opinion slight weight. Tr. 17.

A state agency psychologist, Dr. Kenneth Burstin, reviewed Freeman's records in October 2013. He noted the June 2013 hospital admission for suicidal ideation. But he

concluded that psychiatric medication had been effective when Freeman took it, and Freeman had "no inherent barriers to compliance." Tr. 68. Dr. Burstin explained that although the possibility of drug or alcohol abuse was noted at the time of the admission, no one had made a drug or alcohol abuse-related diagnosis. He further stated that Freeman "is able to obtain indigent services in his locale" and that Freeman's "reported lack of finances apparently did not preclude [drug and alcohol abuse.]" *Id.* Dr. Burstin concluded that Freeman's "mental limitations are potentially not severe by duration." *Id.* The ALJ gave Dr. Burstin's opinion "great weight … through the date of [Dr. Burstin's] review." Tr. 15.

A vocational expert opined at the hearing that Freeman's past work as a fast food cook was classified as medium or heavy, skilled work; housekeeping was light work, unskilled; and commercial or institutional cleaner was heavy, unskilled. The VE testified that a person of Freeman's background, who had no additional exertional limitations, but had environmental limitations of avoiding concentrated exposure to fumes, poor ventilation, and odors, and could have no exposure to heights or hazards could not perform Freeman's past work, but could perform work as a machine packager (medium, unskilled), photocopying operator (light, unskilled), and mail clerk (light, unskilled). The VE testified that if the individual had to use a cane in the left hand whenever standing or walking, he could not perform the jobs identified. But the individual could perform other jobs such as small products assembler, ticket seller, and cashier II, all three of which are light, unskilled jobs. But if the individual was off-task and not performing his job 20 % of the time, due to the need to lie down or the distraction of hearing voices, then no competitive employment would be available.

### D. The ALJ's Decision

The ALJ found that during the relevant period, Freeman had severe impairments of

"various respiratory impairments diagnosed to include: asthma, chronic obstructive pulmonary disease, and emphysema[,]" and the residual functional capacity to perform:

> [M]edium work as defined in 20 CFR 404.1567(c) and 416.967(c) except concentrated exposure to extreme cold, heat, humidity, fumes, poor ventilation, and odors must be entirely precluded from the assigned work area and as should exposure to heights or hazards.

Tr. 13, 18.

The ALJ determined Freeman is not capable of performing past relevant work, can do other jobs that exist in significant numbers in the local and national economy, such as machine packager, photocopying machine operator, and mail clerk.

## II. Discussion

Freeman challenges the ALJ's findings at Step 2, in that the ALJ did not include any severe mental health impairments. He also challenges the RFC finding with respect to his exertional abilities, arguing that the RFC lacks substantial evidentiary support because there is no opinion by a treating or examining medical provider. He asks that the decision be reversed and the case remanded for further development of the record.

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than preponderance, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions, [the court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

### A. Failure to include paranoid schizophrenia as a severe impairment at Step 2

At Step 2 of the sequential evaluation process, the ALJ must determine if the claimant's

8

Case 4:15-cv-00968-NKL   Document 13   Filed 09/06/16   Page 8 of 15

impairments are severe. 20 C.F.R. § 404.1520(c); 20 C.F.R. § 416.920(c). A severe impairment is one that significantly limits the claimant's ability to do basic work activities. *Id.* The standard of proof for a severe medical impairment is *de minimis*. *Bowen v. Yuckert*, 482 U.S. 137, 153-54 (1987). The only type of impairment that will not be considered "severe" is one that is only a "slight abnormality." *Id.*; SSR 96-3p, 1996 WL 374181 (7/2/1996). According to the Eighth Circuit, a finding of "non-severe" should only occur in rare circumstances. *Householder v. Bowen*, 861 F.2d 191 (8th Cir. 1988).

The ALJ is to consider medical evidence alone at this step of the process to assess the impact of an impairment on the ability to perform basic work activities, SSR 85-28, 1985 WL 56856, *4 (1985), but "may not draw upon his own inferences from medical reports[,]" *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975).

In concluding Freeman had no more than mild limitations in any domain of functioning, the ALJ noted Freeman could go outside and water his grass; could take care of his personal needs; could make a sandwich and microwave meals; had gone to church in the past year; had gone to a funeral which demonstrated he could "engage in some social interaction"; and had had mental status exams between August and September 2014 that showed normal intelligence and intact recent and remote memory. Tr. 16. On the other hand, the record shows Freeman was suicidal in 2013 and had a 12-day hospital stay; has consistently been assigned GAF scores of 50 or lower, indicating at least serious symptoms[1]; continued to report and receive treatment for

---

[1] According to the *Diagnostic and Statistical Manual of Mental Disorders*, the GAF score is used to report the clinician's judgment of the individual's overall level of functioning, and consists of a number between zero and 100 to reflect that judgment. *Hurd v. Astrue,* 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 51 and 60 indicates moderate symptoms, such as flat affect and circumstantial speech, occasional panic attacks, or moderate difficulty in social, occupational, or school functioning, such as few friends, or conflicts with peers or co-workers. A GAF score between 41 and 50 indicates serious symptoms, such as

9

paranoia, auditory hallucinations, and depression; continued to receive assistance from a community support program for independent living; was stressed by his multiple health issues and family deaths; and stayed in his house to avoid people, and to avoid being out when it was dark.

A GAF score is a measure of a claimant's entire mental health, not merely mental health at the time of the assessment, *Sorenson v. Astrue,* 2008 WL 1914746 (N.D. Iowa 2008), as the ALJ here suggests. The eight scores given Freeman between June 2013 and September 2014 were consistent with the treatment notes, over time, and between Freeman's providers, and consistently indicated at least serious symptoms. No scores above 50 were noted by any evaluators. The ALJ did not give good reasons for discounting them. *See Marino v. Astrue,* 2009 WL 3164091 (E.D. Mo. 2009), *aff'd* 373 Fed. Appx. 662 (8th Cir. 2010) (remand was necessary where ALJ failed to give good reasons for discounting GAF scores; the claimant's GAF scores were consistent with his treating physician's notes, no higher scores were in record, and no other medical evidence was presented concerning claimant's ability to function in the workplace).

Further, whether Freeman smiled at a psychiatric visit, had no hallucinations at the time of a visit, or was able to go out of state to a funeral does not mean he has non-severe psychiatric symptoms. Mental illness is episodic by nature, symptoms can wax and wane, and an individual can have good days and bad days, such that a snapshot of any single moment may indicate little

---

suicidal ideation, severe obsessional rituals, or frequent shoplifting, or any serious impairment in social, occupational, or school functioning, such as no friends, or inability to keep a job. And a GAF of 31-40 is defined as having some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood, such as avoiding friends, neglecting family, and being unable to work. *Id.; see also Hudson v. Barnhart,* 345 F.3d 661, 663 n. 2 (8th Cir. 2003); and *Pupil v. Colvin,* 2016 WL 4502533, *2 n.4 and *9 (E.D. Mo. 8/29/2016).

about the individual's overall condition. *Fuchs v. Astrue*, 873 F.Supp.2d 959 (N.D. Ill 2012). That Freeman ran out of medication once, as the ALJ pointed out, does not necessarily mean he chose not to take it. Non-compliance can be a symptom of a mental illness, rather than willful misconduct. *Grimaldo v. Colvin,* 2014 WL 2547070 (N.D. Tex. 2014); *Grossweiler v. Barnhart,* 2003 WL 22454928 (W.D. Tex. 2003). His providers noted he was willing to work on his mental health issues, he actively participated in discussions about what medications helped or had side effects, he generally took his medications, and he consistently kept his numerous appointments with his psychiatrist, therapist, and other providers. In any event, Freeman continued to report symptoms even when he was taking his medication.

Furthermore, the limited daily activities identified by the ALJ are not the kinds of activities demonstrating the kind of abilities and independence one would associate with a person whose symptoms are non-severe, particularly in view of the fact that Freeman was continually monitored by a psychiatrist and a therapist, received significant community support services at the rehabilitative level, had been encouraged to participate in a day program twice a week, and lived with a relative. *See Lonidier v. Colvin*, 2014 WL 2864771, at *19 (E.D. Mo. June 24, 2014) (the claimant's abilities to engage in some daily activities, such as preparing meals, cutting the grass, and grocery shopping, did not demonstrate she had no disabling psychotic symptoms, especially in view of the fact that she was continually monitored and assisted by a clinical caseworker through a mental health program). Persons with chronic psychotic or affective disorders commonly structure their lives in such a way as to minimize stress and reduce symptoms and signs, and in such a case, the person may be "much more impaired for work than [his] symptoms and signs would indicate." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(E); *see also Andler v. Chater,* 100 F.3d 1389, 1393 (8th Cir.1996) (discussing regulation). The ALJ

should have considered the extent to which the support Freeman received controlled or attenuated his symptoms. *See Lonidier*, 2014 WL 2864771, at *19; 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(F).

Further, in deciding that Freeman's paranoid schizophrenia did not qualify as a severe impairment, the ALJ gave great weight to the opinion of a non-treating, non-examining consultant, Dr. Burstin, who reviewed Freeman's records in October 2013. The ALJ gave only "slight" weight to the October 2014 opinion of Dr. Reddy, Freeman's treating psychiatrist, who opined about Freeman's limitations in performing work-related activities, and the number of days per month that Freeman was likely to miss due to mental health issues. The opinion of a person who has not examined a claimant, and which was rendered only months after the alleged onset date, is not substantial evidence that the person is not disabled. *See Brock v. Secretary of Health and Human Services,* 791 F.2d 112, 114 (8th Cir. 1986) (The statements of physicians who never personally examined the claimant but only reviewed the reports of examining physicians do not constitute substantial evidence on the record as a whole). *See also Van Horn v. Heckler,* 717 F.2d 1196, 1198 (8th Cir. 1983).

Dr. Reddy's opinion, in contrast, which was consistent with the doctor's treatment notes and the rest of the medical record, including the annual evaluation and the series of GAF scores, and was informed by a longitudinal view of Freeman's mental health history, is the only substantial evidence of Freeman's ability to work. *See Spillers v. Colvin*, 24 F. Supp.3d 818, 825 (S.D. Iowa 2014) (holding that the plaintiff's two treating physician's opinions were the only evidence of his ability to work, when the only other opinion came from a non-examining physician). *See also Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

The ALJ's evaluation of Freeman's paranoid schizophrenia as non-severe is not

supported by substantial evidence on the whole record. In view of the foregoing, remand is appropriate for further consideration at Step 2 of Freeman's paranoid schizophrenia, and for further development of the record as appropriate. *Buckner v. Apfel,* 213 F.3d 1006, 1011 (8th Cir. 2000); *Nicola v. Astrue,* 480 F.3d 885, 887 (8th Cir. 2007). *See also* 20 C.F.R. § 404.1512(e) (the ALJ should seek additional evidence or clarification from a claimant's medical source, if a report does not contain all necessary information, or there is an ambiguity or conflict that must be resolved).

### B. Formulation of the RFC

Residual functional capacity is what a claimant can still do despite physical or mental limitations. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); Social Security Ruling 96-8p, 1996 WL 374184, *5 (July 2, 1996). An ALJ must formulate the RFC based on all of the relevant, credible evidence of record. *See Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.") (*quoting Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)). The RFC determination must be supported by substantial evidence, including at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000). Evidence relevant to the RFC determination includes medical records, observations of treating physicians and others, and a claimant's own description of his limitations. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000) (citation omitted). The claimant has the burden to prove his or her RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

Here, Freeman testified that he had limited ability to walk due to shortness of breath and to knee pain, and he had to use a cane because his knees could give out. The medical record

13

reflects 22 emergency room visits and hospitalizations, and 12 doctor visits for treatment of respiratory problems, including shortness of breath upon exertion, or even while sleeping. Although a provider noted Freeman walked two or three miles a day in March 2014, in June 2014 another provider noted Freeman had respiratory distress when walking inclines and stairs, and in 2015 a provider noted Freeman failed a stair-walk test. He has also had positive findings upon physical exam, and after an MRI, relating to his knees and uses a cane for ambulation. The evidence of noncompliance with treatment for breathing problems to which the Secretary points predates the alleged onset date. Furthermore, whether Freeman smoked 10 cigarettes a day and had been counseled to quit, as the Secretary notes, it is one factor that may be considered, *see Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000), not a controlling one.

The bottom line for purposes of Freeman's argument about support for the RFC is that although the ALJ concluded Freeman cannot perform his past work, the record contains no medical opinion, from any acceptable medical source, whether examining or not, of Freeman's physical ability to work now, and does not otherwise contain substantial medical evidence supporting the ALJ's conclusion with respect to the physical RFC. *Stallings v. Colvin,* 2015 WL 1781407 (W.D. Mo. 2015) (an ALJ may appropriately determine a claimant's RFC without a specific medical opinion, but only if there is sufficient medical evidence in the record). The ALJ certainly may not draw her own conclusions about the severity of Freeman's impairments. *Lund v. Weinberger,* 520 F.2d 782, 785 (8th Cir. 1975).

Therefore, the case must be remanded so that the ALJ can obtain an opinion from a treating physician, or a consultative examination, with respect to Freeman's physical functioning. *See Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir. 2000) (ALJ concluded the claimant could not return to past work, but there was no medical evidence about the claimant's ability to function

presently; case remanded); *see also Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2003) (remanding for further development of the record where the ALJ relied on the report of a non-examining consultant and the ALJ's own reading of the treatment notes, instead of contacting the claimant's treating physician for an assessment of how the claimant's impairments limited his ability to engage in work-related activities), and *Galant v. Astrue*, 2012 WL 3993717, *2-3 (W.D. Mo. Sept. 11, 2012) (remanding for consideration of additional evidence where the ALJ found the claimant was unable to perform her past work and then relied on the opinion of a non-examining physician to find that the claimant could perform other work).

Because the ALJ must reexamine Freeman's mental health issues at Step 2, the findings of severe impairments may change, and the RFC determination may therefore change. Accordingly, Freeman's argument concerning support for the RFC in terms of mental health issues will not be addressed at this time.

**III. Conclusion**

The Commissioner's decision is reversed and the case remanded for further proceedings consistent with this Order.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  September 6, 2016
Jefferson City, Missouri

15

Case 4:15-cv-00968-NKL   Document 13   Filed 09/06/16   Page 15 of 15